**In re CEI ROOFING, INC., et al., Debtors.**

**No. 04–35113 HDH–11.**

United States Bankruptcy Court, N.D. Texas, Dallas Division.

May 6, 2004.

Opinion Issued July 7, 2004.

Keith Miles Aurzada, Akin Gump Strauss Hauer & Feld, LLP, Dallas, TX, for Debtor.

Joseph J. Wielebinski, Munsch Hardt Kopf & Harr, Dallas, TX, for Official Committee of Unsecured Creditors.

George F. McElreath, Office of the U.S. Trustee, Dallas, TX, for U.S. Trustee.

*ORDER GRANTING EMERGENCY MOTION OF DEBTORS FOR AN ORDER PURSUANT TO SECTIONS 105(a) AND 363(b) OF THE BANKRUPTCY CODE (I) AUTHORIZING THE PAYMENT OF EMPLOYEE OBLIGATIONS AND (II) AUTHORIZING FINANCIAL INSTITUTIONS TO HONOR AND PROCESS CHECKS AND TRANSFERS RELATED TO SUCH OBLIGATIONS*

HARLIN D. HALE, Bankruptcy Judge.

Upon the Emergency Motion of Debtors for a Order Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code (I) Authorizing the Payment of Employee Obligations and (II) Authorizing Financial Institutions to Honor and Process Checks and Transfers Related to Such Obligations (the "Motion"), filed by the above-captioned debtors and debtors in possession, CEI Roofing, Inc. and its affiliated debtors (collectively, the "Debtors"), and the Court having jurisdiction to consider the Motion, having heard the evidence and statements of counsel regarding the Motion, and finding that no further notice is needed, it is therefore:

**ORDERED**, that the Motion is GRANTED; and it is further

**ORDERED**, that the Debtors are authorized but not directed to pay the Employee Payroll Obligations in accordance with the Debtors' stated policies, in the sole discretion of the Debtors, in the exercise of their business judgment; and it is further

**ORDERED**, that the Debtors are authorized but not directed to maintain all other Benefit Programs, including the following policies, in their sole discretion, and in the exercise of their business judgment: Health Benefit Plans; Retirement Benefit Obligations; reimbursement of Expenses; Employee Paid Time–Off Obligations; Workers' Compensation, and all other Benefit Programs; and it is further

**ORDERED**, that the Debtors' banks are authorized to honor checks drawn on or requests for transfer of funds in the ordinary course for the purposes of clearing the obligations owed to the Debtors' Employees as set forth in the Motion; and it is further

**ORDERED**, that this Court shall retain jurisdiction with respect to all matters arising from or related to the implementation of this Order; and it is further

**ORDERED**, that notwithstanding the possible applicability of Bankruptcy Rules 6004(g), 7062, 9014, or otherwise, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry; and it is further

**ORDERED**, that all time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a); and it is further

**ORDERED**, that this Court shall retain jurisdiction over all matters arising from or related to the interpretation and implementation of this Order.

## MEMORANDUM OPINION

May a Chapter 11 debtor-in-possession pay, before plan confirmation, employee wages and benefits that were incurred prepetition and that qualify as priority claims under § 507(a)(3) and/or (4) of the Bankruptcy Code? This is the issue presented to the court by the Debtors in their Emergency Motion for an Order Pursuant to Sections 105 and 363(b) of the Bankruptcy Code (I) Authorizing the Payment of Employee Obligations and (II) Authorizing Financial Institutions to Honor and Process Checks and Transfers Related to Such Obligations ("Employee Wage Motion") filed as part of the "first day" pleadings. Because the issue is a recurring one in bankruptcy cases, this Court set out to determine the statutory basis, if any, for the relief sought by the Debtors.

After reviewing the relevant Bankruptcy Code provisions, the record made at the hearing on the matter, and case law allowing the payment of "critical vendors," this Court concludes that the Debtors may pay, prior to confirmation of a plan of reorganization, the prepetition wage claims of employees to the extent that such claims, individually, qualify as priority wage claims under § 503(a)(3) of the Code. An order was entered granting the Employee Wage Motion on May 6, 2004 ("Wage Order"). This Memorandum Opinion is entered in connection with the Wage Order.

### The Debtors

General Roofing Service, Inc. ("GRS"), the parent of CEI Roofing, Inc. ("CEI"), CEI, and 27 other subsidiaries of GRS (together, the "Debtors") filed for relief under Chapter 11 on or about May 3, 2004. The Debtors are a leading comprehensive provider of commercial roofing in the United States. They have 36 operating locations in 23 states and provide roofing

services including new roof construction, replacement or restoration of exiting roofing systems, and emergency and proactive maintenance.

The Debtors have approximately 2,400 employees, 30 of whom are corporate personnel. Approximately 450 of these employees work for a salary, and the rest are hourly employees. Many of the hourly employees install, repair, and maintain roofs. The record suggests that these employees have modest incomes and live mostly from paycheck to paycheck.

Debtors, in their Employee Wage Motion, sought to continue to pay their employee payroll obligations, including unpaid payroll for wages earned within ten days of the petition date, in the ordinary course of their business. Debtors proposed to pay prepetition wages and commissions of up to $4,650 per employee and to continue certain other employee benefits, including retirement benefits, vacation, paid time off, expense reimbursement, and worker's compensation insurance.

According to the Debtors, the prepetition claims of the employees for which payment authority is sought are priority claims under Bankruptcy Code § 507(a)(3) (wages and commissions of $4,650 or less) and (4) (claims for contributions to employee benefit plans). Thus, argue the Debtors, granting authority to pay such claims is a timing issue only.

Importantly, no party in interest has objected to the relief sought, and the Debtor's alleged secured creditor has agreed to the use of its cash collateral to fund the payment of the employee wages and benefits.

### Treatment of Prepetition Claims During the Pendency of a Case

A bankruptcy court's authority to authorize the payment of prepetition claims before plan confirmation has been the subject of much litigation in recent years. *See e.g., In re Kmart Corp.,* 359 F.3d 866 (7th Cir.2004), *In re Mirant Corp.,* 296 B.R. 427 (Bankr.N.D.Tex.2003); *In re CoServ, L.L.C.,* 273 B.R. 487 (Bankr. N.D.Tex.2002); *In re Equalnet Communications Corp.,* 258 B.R. 368 (Bankr. S.D.Tex.2000). Most courts looking at the issue have struggled to find a statutory basis for the payment of prepetition claims during the pendency of the case. The motions are usually in the nature of requests to pay so called "critical vendors" and invariably urge that the payment of certain prepetition unsecured claims is necessary to assure postpetition performance of services or delivery of goods by those vendors.

In *In re Kmart Corp.,* 359 F.3d 866 (7th Cir.2004), the most recent circuit court opinion regarding "critical vendor" motions, the Seventh Circuit affirmed the district court's reversal of the bankruptcy court's critical-vendors order that granted Kmart "open-ended permission to pay any debt to any vendor it deemed 'critical' in the exercise of unilateral discretion, provided that the vendor agreed to furnish goods on 'customary trade terms' for the next two years." *Id.* at 868–69. The bankruptcy court order cited § 105(a) but did not offer any explanation or legal analysis to support its order. *Id.* at 869. Pursuant to the authority granted to it by the bankruptcy court, Kmart paid, in full, the prepetition unsecured claims of 2,330 suppliers in the total amount of about $300 million. The payments came out of the $2 billion debtor-in-possession ("DIP") financing authorized by the bankruptcy court. The DIP lenders were granted super-priority in post-petition assets and revenues. Creditors not considered "critical" were not paid and ultimately received about 10 cents on the dollar, mostly in stock of the

reorganized Kmart. *Id.* One of the non "critical" creditors appealed the critical-vendors order to the district court. Concluding that neither § 105(a) nor the "doctrine of necessity" authorized the payment of the prepetition claims, the district court reversed. *Id.*

The Seventh Circuit affirmed the district court. In doing so, the court agreed with the district court that neither § 105(a) nor the "doctrine of necessity" authorized the payment of prepetition unsecured claims, stating that § 105(a) "does not create discretion to set aside the Code's rules about priority and distribution" and called the "doctrine of necessity" "just a fancy name for a power to depart from the Code." *Id.* at 871. The court also rejected the debtor's suggestions that § 364(b) and § 503 of the Bankruptcy Code provide a statutory basis for paying "critical vendors." *Id.* at 872. The court noted that while § 364 authorizes a debtor to obtain credit with court approval, it "has nothing to say about how the money will be disbursed or about priorities among creditors." *Id.* Regarding § 503, relating to administrative expenses, the court found no basis for elevating a prepetition claim to a postpetition administrative claim:

> Pre-filing debts are not administrative expenses; they are the antithesis of administrative expenses. Filing a petition for bankruptcy effectively creates two firms: the debts of the pre-filing entity may be written down so that the post-filing entity may reorganize and continue in business if it has a positive cash flow. Treating pre-filing debts as "administrative" claims against the post-filing entity would impair the ability of bankruptcy law to prevent old debts from sinking a viable firm.

*Id.* The court's rejection of §§ 364 and 503 as statutory bases for authorizing critical vendor payments left it with consideration of § 363(b)(1), the section of the Code dealing with the use of property of the estate "other than in the ordinary course of business." The appeals court, however, did not reach a conclusion as to whether § 363(b) provided a bankruptcy court with authority under the Code to authorize the payment of prepetition "critical vendor" claims because it found that even if § 363(b) could provide such authority, in principle, the bankruptcy court could not have authorized it under the facts of the Kmart case. *See id.* ("We need not decide whether § 363(b)(1) could support payment of some pre-petition debts, because *this* order was unsound no matter how one reads § 363(b)(1).").

The court suggested that if authority to pay critical vendors could be found in § 363(b)(1), the debtor would have had to show that (1) the critical vendor would have ceased doing business with the debtor absent the payment of the creditor's prepetition claim, (2) there was no other alternative to the payment of the prepetition claim (such as the issuance of a letter of credit to assure vendors of payment for postpetition deliveries or services), i.e., that "discrimination among unsecured creditors was the only way to facilitate a reorganization," and (3) "disfavored creditors were at least as well off as they would have been had the critical-vendors order not been entered." *Id.* at 873–74. Although mentioning the first two factors, the court seemed to hang its hat on the third factor in affirming the district court's reversal of the bankruptcy court's critical-vendors order: "Even if § 362(b)(1) [sic] allows critical-vendors orders in principle, preferential payments to a class of creditors are proper only if the record shows the prospect of benefit to the other creditors. This record does not, so the critical-vendors order cannot stand." *Id.* at 874. Thus, although the Seventh Circuit did not find that the entry of a critical vendors

order was proper in the *Kmart* case, it left open the possibility that in another case under different circumstances such an order might be authorized under § 363(b)(1).

### Section 105, Payment of Prepetition Claims, and the Fifth Circuit

Years prior to the issuance by Seventh Circuit of the *Kmart* opinion, the Fifth Circuit addressed the issue of whether § 105(a), alone, provides sufficient authority for the bankruptcy court to order the payment of a prepetition unsecured claim out of postpetition funds prior to the confirmation of a plan. *In re Oxford Mgmt., Inc.,* 4 F.3d 1329 (5th Cir.1993). In that case, the bankruptcy court had ordered the debtor to pay certain prepetition unsecured claims because "equity necessitated payment." *Id.* at 1334. The Fifth Circuit observed that "neither the appellees nor the bankruptcy court cited a specific provision of the Code that would allow the payment of post-petition funds to satisfy pre-petition claims." *Id.* The court found that the bankruptcy court's order constituted an attempt to use § 105(a) to effectuate a substantive alteration of the provisions of the Bankruptcy Code, something that the court had held to be impermissible in its earlier decision of *United States v. Sutton,* 786 F.2d 1305 (5th Cir.1986). *Oxford Management.,* 4 F.3d at 1334. As the court noted, *Sutton* stood for the proposition that the bankruptcy court's equitable powers under § 105(a) "must be exercised in a manner that is consistent with the Bankruptcy Code," *id.* (citing *Sutton,* 786 F.2d at 1308 and *In re Texas Consumer Finance Corp.,* 480 F.2d 1261, 1265 (5th Cir.1973)), and that § 105(a) "does not authorize the bankruptcy courts to create substantive rights that are otherwise unavailable under applicable law, or constitute a roving commission to do equity." *Id.* (quoting *Sutton,* 786 F.2d at 1308).

### Effect of Oxford Management on Preconfirmation Payment of Prepetition Claims

■ As a general proposition, a bankruptcy court cannot use its equitable powers under § 105(a) to authorize an action that would be either inconsistent with or prohibited by another provision of the Bankruptcy Code. *See Norwest Bank Worthington v. Ahlers,* 485 U.S. 197, 206, 108 S.Ct. 963, 969, 99 L.Ed.2d 169 (1988)("[W]hatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of the Bankruptcy Code."); *Oxford Management,* 4 F.3d at 1334. Under *Oxford Management,* § 105(a), alone, cannot form the basis for a court's authority to authorize the payment of prepetition unsecured claims out of postpetition funds prior the confirmation of a plan. However, the court in *Oxford Management* did not consider (because neither the holder of the prepetition unsecured claim seeking payment from the debtor in that case nor the bankruptcy court cited any provision in the Code aside from the court's general equitable powers contained in § 105(a) as authority for the bankruptcy court's order) whether any *other* provision in the Code, either alone or in conjunction with § 105(a), could provide the authority for a court to authorize such payments. After *Oxford Management,* then, the question is whether another provision in the Bankruptcy Code authorizes the payment of these prepetition unsecured claims either directly or indirectly, through § 105(a), as "necessary or appropriate to carry out the provisions of [the Code]." If so, an order authorizing such payments would not be prohibited under *Oxford Management.*

Recently, two well-reasoned opinions in this district have addressed this very question. *See In re Mirant Corp.,* 296 B.R. 427 (Bankr.N.D.Tex.2003); *In re CoServ,*

*L.L.C.*, 273 B.R. 487 (Bankr.N.D.Tex.2002). In *CoServ*, the court recognized that the Fifth Circuit, in *Oxford Management*, came "perilously close" to the view that the payment of prepetition unsecured claims prior to plan confirmation is not authorized under the Code. *See CoServ*, 273 B.R. at 495 (citing *In re Oxford Management, Inc.*, 4 F.3d 1329, 1333–34 (5th Cir.1993)). In the *CoServ* case, CoServ and its related entities, in the telecommunications business, filed for bankruptcy under Chapter 11. As part of their "first-day pleadings," the Debtors sought authority to pay more than $2.2 million in prepetition unsecured claims on the basis that these creditors were "critical vendors" that could be paid pursuant to the "doctrine of necessity." The lender initially opposed the motion, but after the debtors narrowed its list of "critical vendors" down to seven creditors to whom the debtors wished to pay just over $550,000, the lenders withdrew their objection and announced that they neither objected to nor supported the motion. Citing its "independent obligation to ensure that the Bankruptcy Code is complied with," the absence of the United States trustee from the continued hearing on the motion, and the Committee's suggestion that there were other "critical vendors" awaiting a favorable ruling on the issue so that they, too, could seek payment of their pre-petition claims, the court declined to grant the debtors' motion solely on the basis that it was now unopposed. *Id.* at 490–91.

The court addressed the debtors' suggestions that the court's statutory authority to authorize the payment of prepetition unsecured claims prior to confirmation lay in § 105(a) of the Bankruptcy Code, as well as possibly § 363 regarding a court's ability to authorize a debtor to use property of the estate other than in the ordinary course of business, § 1107(a) regarding the powers of a debtor in possession, or § 549(a) regarding a court's power to reverse a post petition transfer. *Id.* at 491–92. The court rejected the suggestion that either § 363 or § 549 provided support for the pre-confirmation payment of prepetition claims and came to the conclusion that "[o]nly Section 105(a) offers the equitable muscle that would allow a bankruptcy court to violate one of the principal tenets of Chapter 11: that prepetition general unsecured claims should be satisfied on an equal basis pursuant to a plan." *Id.* at 493 (footnote omitted).

After a discussion of case law, the court determined that the debtor-in-possession's role as the equivalent of a trustee under § 1107(a) and its duty to protect the going-concern value of an operating business in a Chapter 11 provided the "bridge that makes application to the Doctrine of Necessity 'necessary or appropriate to carry out the provisions of' the Bankruptcy Code." *Id.* at 497 (quoting 11 U.S.C. § 105(a)). In reaching this conclusion, the court found that "[t]here are occasions when [the duty to preserve the going-concern value of the debtor] can only be fulfilled by the preplan satisfaction of a prepetition claim." *Id.* at 497. Even so, the court noted that, "[e]xcept where an unsecured claim, non-payment of which could impair a debtor's ability to operate, has been accorded priority treatment by Congress and existing senior creditors consent or are clearly provided for, a bankruptcy court may order payment of unsecured prepetition claims only under the most extraordinary circumstances." *Id.* at 493.

Because the court did not find an adequate test in existing case law for determining when the payment of a prepetition claim should or could be authorized pre-confirmation, it developed its own three-part test:

First, it must be critical that the debtor deal with the claimant. Second, unless it deals with the claimant, the debtor risks the probability of harm, or, alternatively, loss of economic advantage to the estate or the debtor's going concern value, which is disproportionate to the amount of the claimant's prepetition claim. Third, there is no practical or legal alternative by which the debtor can deal with the claimant other than by payment of the claim.

*Id.* at 498.

It is important to emphasize, for purposes of the motion that is before this Court, the distinction that the court in *CoServ* made between the situation contemplated in the motion before it (i.e., the preplan payment of regular prepetition unsecured "critical vendor" claims) from the situation where a debtor seeks to pay the prepetition priority wage claims of employees (which is what is sought in the instant motion before this court). When senior creditors consent or are clearly provided for, the bankruptcy court may authorize the payment of the prepetition priority employee wage claims. *Id.* at 493 n. 10. Although the *CoServ* court specifically did not express an opinion "regarding payment of Section 507(a)(3) claims in a case commenced involuntarily in which claims entitled to priority under Section 507(a)(2) remain outstanding," the court noted that "wage claims typically are payable out of necessity as well as by virtue of their priority." *Id.*

In a more recent opinion, Judge Lynn reaffirmed the three-factor test set out in *CoServ*. *In re Mirant Corp.*, 296 B.R. 427, 429 (Bankr.N.D.Tex.2003). In *Mirant,* however, the court allowed the debtors, in the business of generation and sale of electric power, to pay, without obtaining prior approval from the court, the prepetition claims of the "critical vendors" whom they believed met the *CoServ* test. *Id.* at 429–30. The court prefaced its allowance of pre-approval payment of prepetition unsecured claims by citing its concerns regarding the requirement of advance approval by the court:

> Besides the concern that a requirement of advance court approval in every instance as a prerequisite to payment of a prepetition claim could lead to an interruption of Debtors' generation of power, the court does not wish Debtors' businesses seriously damaged by the delay required to satisfy the court that a particular creditor should be paid its prepetition claim outside of a confirmed plan.

*Id.* at 429. The court stated that if the Debtors, upon advice of counsel, reasonably believed that a prepetition claim would be authorized to be paid under the *CoServ* test, the Debtors could pay such claim. *Id.* After payment of such claim, the Debtors would be required to file with the court, and provide to the United States Trustee and any committee appointed under § 1102 of the Bankruptcy Code, "an accounting of each such claim paid, including the bases on which such claim satisfies the *In re CoServ* test." *Id.* at 430. The Debtors and the creditor paid would then be required to show cause why the payment should be deemed to be properly authorized only "[u]pon motion of any party in interest filed within thirty (30) days of such accounting." *Id.* at 430.

The court also permitted the Debtors to pay prepetition unsecured claims even if the Debtors did not believe that such claims would satisfy the *CoServ* test. *Id.* In such a situation, upon the filing of a motion by the Debtors or the claimant, the claimant would have to show cause why the entity may require payment of its claim prior to providing further goods or services to the Debtors. *Id.* If it is deter-

mined by the court that the entity had not been entitled to require payment of its claim under *CoServ,* the entity would have to repay the Debtors the amounts paid on account of the prepetition claim, but, provided that it continued to do business with the Debtors, would not suffer further sanctions under § 362(a)(6). *Id.* The court further ordered that

> [a]n entity that demands payment of prepetition debt as a condition to providing postpetition goods or services to Debtors and refuses to furnish such goods and services as otherwise provided in this order shall be required to show cause why it should not be sanctioned for violation of section 362(a)(6) of the Code in an amount consistent with any damages incurred by Debtors by reason of such entity's refusal.

*Id.* Lastly, the court placed holders of prepetition unsecured claims on notice that any attempt to hold any of the Debtors hostage by unreasonably demanding payment of a prepetition claim before providing postpetition goods or services to the Debtor would risk a finding by the court that the claimant had willfully violated the automatic stay:

> Any entity provided with a copy of this order shall be deemed on notice that a refusal to provide postpetition goods or services to any Debtor by reason of nonpayment of any prepetition debt, and despite assurance, in the form of a deposit or prepayment, that such entity will suffer no loss through provision of postpetition goods or services, absent good cause, constitutes a willful violation of section 362(a)(6) of the Code.

*Id.*

Judge Greendyke of the Bankruptcy Court for the Southern District of Texas has also addressed the issue of whether, after *Oxford Management,* a debtor-in-possession may pay prepetition unsecured claims prior to confirmation of a plan. *In re Equalnet Communications Corp.,* 258 B.R. 368 (Bankr.S.D.Tex.2000). In *Equalnet,* the debtors moved for authority to pay certain prepetition claims prior to confirmation of a plan. *Id.* at 369 The claims fell into two categories: the claim of a contract employee for work performed prepetition and the claims for "billing credits" attributable to billing and service errors relating to prepetition periods. *Id.* The court recognized that, in similar situations in the past, it had noted that "the payment of prepetition claims prior to confirmation of a plan in a Chapter 11 case has been proscribed by the 5th Circuit in [*Oxford Management*]." *Id.* However, the court pointed out that in certain cases, some courts have found exception to the "general rule of nonpayment" announced in *Oxford Management. Id.* The court's only commentary on the basis for these exceptions was that they "arise primarily out of common sense and the presence of a legal or factual inevitability of payment." *Id.* The four exceptions listed by the court were: (1) turnover of cash collateral, (2) payment of cure amounts in the context of the assumption of an executory contract or lease, (3) payments that are "at once individually minute but collectively immense and critical to the survival of the business of the debtor" such as the redemption of prepetition retail coupons, the honoring of credit card debits, credits, and chargebacks, or the issuance of billing credits to retail customers in connection with prepetition telephone services and invoices, and (4) employee wage claims and certain tax claims that "enjoy a priority status in addition to being sometimes critical to the ongoing nature of the business." *Id.* at 369–70. The court also pointed out that "[i]f there is agreement among *all* of the constituencies and if each of them is a sophisticated, competently represented, knowledgeable constituency, the Court is

generally loathe to substitute its business judgment about the consequences of the proposed course of action for that of the parties that hold the real financial interest" *Id.* at 370.

This Court observes that another provision of the Bankruptcy Code arguably allows for the possibility of the payment by a debtor-in-possession of certain general unsecured prepetition claims prior to confirmation: § 362. Section 362(a)(6) provides that the filing of the petition acts as a stay of "any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title." 11 U.S.C. § 362(a)(6). Under this provision, the collection of prepetition claims is not prohibited; it is only stayed. The *stay* of the collection of prepetition claims may be terminated, annulled or modified by the court "for cause." 11 U.S.C. § 362(d). In fact, the language of § 362(d) provides that "the court *shall* grant relief from the stay ... for cause ...." *Id.* (emphasis added). Furthermore, relief from the stay pursuant to § 362(d) may be requested by a "party in interest." *Id.* Thus, a debtor-in-possession and its "critical vendors," each of whom would certainly qualify as parties in interest in a bankruptcy case, could request relief from the stay under § 362(d) "for cause"—that "cause" being the urgency and necessity of paying the prepetition claims, such payment being the only means of protecting the going concern value of the operating business in Chapter 11. If the court is satisfied, based on the evidence presented by the parties, that "cause" exists for the lifting of the stay to allow the collection of prepetition claims from the estate prior to plan confirmation, it is authorized to do so under § 362(d). Although the court in *CoServ* relied on §§ 105 and 1107 as the bases for authorizing "critical vendor" payments, the same factors as those set forth in *CoServ* could

appropriately govern whether the parties have shown "cause" for the lifting of the stay:

> First, it must be critical that the debtor deal with the claimant. Second, unless it deals with the claimant, the debtor risks the probability of harm, or, alternatively, loss of economic advantage to the estate or the debtor's going concern value, which is disproportionate to the amount of the claimant's prepetition claim. Third, there is no practical or legal alternative by which the debtor can deal with the claimant other than by payment of the claim.

*CoServ,* 273 B.R. at 498.

■ Regardless of which provision in the Bankruptcy Code is relied upon, the Court agrees with the court in *CoServ* that a bankruptcy court must rely on § 105(a) *in conjunction with* another provision of the Code that at least impliedly authorizes such payments. But, in this instance, whether that provision be § 363(b)(1) concerning the debtor-in-possession's use of property of the estate outside of the ordinary course of business, as suggested in the *Kmart* case (but rejected by the court in the *CoServ* case) or § 1107(a), which contains an implied duty of the debtor-in-possession to "protect and preserve the estate, including an operating business' going-concern value," *CoServ,* 273 B.R. at 497, or § 362, which authorizes the court to grant relief from the automatic stay "for cause," (11 U.S.C. § 362(d)(1)), or any of the number of provisions cited by courts and litigants in "critical vendor" litigation, this court need not decide. Indeed, what is presently before this court is not a motion to pay prepetition general unsecured claims but a motion to pay priority wage claims of the debtors' employees. Because Congress has specifically provided that prepetition wage claims up to a certain amount per claim be elevated to

priority status under § 503(1)(3), this Court's job is a little easier than in the critical vendor cases and it need not search for implied authorization in the Code to pay such claims ahead of the general unsecured claims.

### Preconfirmation Payment of Priority Wage Claims

■ While certain conditions must be present for the court to approve the payment of prepetition general unsecured claims, the analysis is not the same for priority claims. What is clear from the case law is that courts are unwilling to say that a bankruptcy court may use § 105, alone, to authorize the payment of prepetition general unsecured claims prior to plan confirmation because of the concern that the payment of such claims would (1) effect a different priority scheme than the priorities established by Congress in the Bankruptcy Code, see, e.g., CoServ, 273 B.R. at 494 ("Congress clearly knew how to place some unsecured claims ahead of others in right to payment."), and (2) result in an unfair and impermissible discrimination among holders of general unsecured claims. See id. ("The goal of equal treatment in liquidation or under a plan suggests Congress would not countenance use by a general unsecured prepetition creditor of a 'critical' position to force payment of a prepetition debt."). Such a use of § 105(a) would be in contravention of the very language employed by Congress in § 105(a) mandating that a bankruptcy court may use the powers given to it under § 105(a) "to carry out the provisions of this title," (11 U.S.C. § 105(a)), hence, the struggle of the courts, clearly existing in the cases dealing with the issue, to find some other provision in the Code to justify the use of § 105 in allowing the payment of prepetition unsecured claims before plan confirmation.

What is equally clear from an analysis of the same case law is that the payment of prepetition wage claims of employees that qualify as priority wage claims under § 503(a)(3) does not trigger the same concerns (i.e., upsetting priorities under the Code and unfair discrimination among general unsecured claims). The obvious reason is that these types of claims are claims that Congress chose to elevate to priority status over other general unsecured claims, thus eliminating the "unfair discrimination" issue and leaving the "priority of payment" issue only in those cases where the holders of claims with a higher priority than wage claims (which, in a voluntary Chapter 11, consist primarily of secured creditors and estate professionals) do not consent to the payment of such claims. In many instances, as in this case, the secured creditor and the professionals consent to the payment of the employee wage claims, thus eliminating the concern that the priorities established under the Code are being upset. When the only parties who could be harmed by an order authorizing the payment of priority wage claims prior to confirmation of a plan consent to such an order, this Court, like the court in Equalnet is not likely to substitute its judgment for that of a "sophisticated, competently represented, knowledgeable constituency." See Equalnet, 258 B.R. at 370. Such judgments are better left to the parties who have an economic stake in the outcome of the bankruptcy case.

In fact, the courts in Equalnet and CoServ recognized the appropriateness and necessity of paying priority wage claims prior to plan confirmation. In Equalnet, the court explained that

[C]ertain types of claims enjoy a priority status in addition to being sometimes critical to the on going nature of the business. For instance, employee wage claims and certain tax claims are both priority claims in whole or in part. The

need to pay these claims in an ordinary course of business time frame is simple common sense. Employees are more likely to stay in place and to refrain from actions which could be detrimental to the case and/or the estate if their pay and benefits remain intact and uninterrupted.

*Id.* at 370. Similarly, the court in *CoServ* implied that a bankruptcy court would have authority to authorize the payment of a prepetition claim prior to confirmation "where an unsecured claim, non-payment of which could impair a debtor's ability to operate, has been accorded priority treatment by Congress and existing senior creditors consent or are clearly provided for." *CoServ*, 273 B.R. at 493. A similar analysis would apply with respect to the payment of an unsecured claim for "contributions to an employee benefit plan" which is given priority under § 507(a)(4).

Thus, there has evolved a rule for the payment of prepetition wages and benefits which is based on both common sense and the express provisions of the Bankruptcy Code. If employees are not paid, they will leave. If they leave the Debtor's business, the bankruptcy case fails shortly after the filing. No one will benefit from the process. The Code gives employees a statutory priority that elevates the claims above the general unsecured claims, and, in fact, most claims in the bankruptcy case. To the extent that the existing holders of claims of higher priority than the wage claims consent or do not timely object, such priority claims may be made during the pendency of the bankruptcy case. The treatment and payment of such claims before confirmation does no violence to the Code or existing case law in this circuit. In fact, such orders are usually "necessary" and "appropriate" to implement a debtor's reorganization under Chapter 11.

In this case, the debtors-in-possession, with the consent of their secured creditor and professionals of the estate, seek authority to pay the priority wage claims of their employees. Considering the consent of the parties and for the reasons set forth above, the Court finds that it has the authority pursuant to § 105 and § 507(a)(3) and (4) to authorize the payment of priority wage claims and employee benefits prior to the confirmation of a plan.