# In the

# United States Court of Appeals

## For the Seventh Circuit

_____

No. 04-4128

IN THE MATTER OF:

  UAL CORPORATION,

*Debtor.*

STATE STREET BANK AND TRUST COMPANY,

*Appellant.*

_____

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 03 C 2328—**John W. Darrah**, *Judge.*

_____

ARGUED JUNE 7, 2005—DECIDED JUNE 21, 2005

_____

Before EASTERBROOK, KANNE, and SYKES, *Circuit Judges.*

EASTERBROOK, *Circuit Judge.*  When United Airlines entered bankruptcy in December 2002, workers owned slightly more than half of its stock through an Employee Stock Ownership Plan. Fearing that the ESOP might sell this stock and that the Internal Revenue Service would deem the sale a change of control, which might jeopardize United's ability to use net operating losses as tax deductions in future years, see 26 U.S.C. §382, United asked the court to forbid sales by the ESOP. Chief Bankruptcy Judge Wedoff granted this motion on the date the bankruptcy began and contin-

ued the injunction after a hearing two months later. The court did not require United to post a bond to protect the ESOP against loss (compare Fed. R. Civ. P. 65(c) with Fed. R. Bankr. P. 7065) or direct United to provide "adequate protection" of the investors' interests under 11 U.S.C. §362(d)(1). State Street Bank and Trust Company, the Trustee of the ESOP, did not ask the district court (or this court) to require security or adequate protection, though it did file an appeal that lingered on the district judge's calendar for almost two years.

While that appeal was pending, the IRS issued a regulation that permits ESOPs to pass shares through to the employees, who may hold or sell them without jeopardizing the issuer's ability to use loss carry-forwards to offset future profits. 26 C.F.R. §1.382-10T. United terminated the ESOP on June 27, 2003, and the Trustee distributed the shares to their beneficial owners, who have since been entitled to hold or sell as they please. The bankruptcy judge's injunction lapsed—it was not formally vacated, but the ESOP it addressed had ceased to exist, so it no longer had any effect. United asked the district judge to dismiss the proceedings as moot. Surprisingly, the judge brushed aside that request and proceeded to affirm on the merits. The Trustee has appealed—though its brief does not explain what relief we could afford given the ESOP's termination— and United has renewed its mootness argument.

Responding to United's position, the Trustee concedes that the underlying dispute was resolved in July 2003 by the shares' distribution to individual investors. Nonetheless, the Trustee contends, the dispute is live because the investors deserve compensation for the loss they suffered between the time of the bankruptcy court's order (when United's stock traded for $1.06 per share) and the dissolution of the ESOP (when the market price had fallen to 76$^{c}$ per share). Although the price has since risen (it was $2.02 the day before this appeal was argued), that gain is inde-

pendent of the litigation: anyone who thought United a good investment could have purchased its stock in the open market. The injury was suffered by those who thought it a bad investment and sold as quickly as they could in June 2003; they lost $30^c$ per share (plus the return on investments available between December 2002 and July 2003) compared with the financial position they would have enjoyed had the bankruptcy judge allowed them to sell earlier. As United sees things, however, this loss is not compensable because there is neither an injunction bond nor an adequate-protection agreement. If monetary relief is unavailable, then the controversy is moot.

The lack of financial security for the investors is unfortunate. The bankruptcy judge apparently believed that the investors were protected by the stock market, which was as likely to rise as to fall during the freeze on sales. That may well be so—in an efficient market today's price is the best estimate of the value of future events, a proposition no less true of bankrupt firms than of flourishing ones—but loss of liquidity is an immediate and independent injury; investors will pay more for tradable shares than for instruments that can be sold only with someone else's sufferance years in the future. The injunction also left investors underdiversified, and thus bearing uncompensated risk. Although the ESOP was deliberately non-diversified, with employees taking investment risk in exchange for control over the issuer, the exchange was no longer worthwhile with control in judicial (and managerial) rather than stockholders' hands. For investors who needed (or wanted) cash rather than certificates, or who wanted to reduce risk by diversifying their holdings, the court's order imposed an inevitable injury.

Requiring investors to bear the costs of illiquidity and underdiversification was both imprudent and unnecessary. United wants to preserve the value of tax deductions that, it contends, are worth more than $1 billion should it return to profitability. There is no reason why investors who need

liquidity should be sacrificed so that other investors (principally today's debt holders) that will own United after it emerges from bankruptcy can reap a benefit; bankruptcy is not supposed to appropriate some investors' wealth for distribution to others. United should have been told to back up its assertions with cash, so that put-upon shareholders could be made whole. If United's views are right, it would not have had any trouble borrowing to underwrite a bond or other form of protection; and if lenders would *not* make such loans, that would have implied to the court that United's contentions are hot air. See *In re Kmart Corp.*, 359 F.3d 866, 873 (7th Cir. 2004).

A carefully drafted adequate-protection agreement could have protected stockholders against an erosion of their position while requiring them to indemnify United if the market price of the stock should rise, and the expense of a bond or other security turn out to have been unnecessary. Because there were gains from trade in this situation, United and the ESOP could have made a mutually beneficial deal outside of bankruptcy. Instead of cramming one side's position down the throat of the other in bankruptcy, the judge should have crafted a mutual-protection covenant that mirrored the likely non-bankruptcy transaction. See *In re James Wilson Associates*, 965 F.2d 160 (7th Cir. 1992); *In re Boomgarden*, 780 F.2d 657 (7th Cir. 1985).

Lack of security is doubly regrettable because the bankruptcy judge's injunction is problematic on the merits. The weaker the claim behind the injunction, the greater the investors' uncompensated risk of injury. The bankruptcy court relied on 11 U.S.C. §105(a) plus §362, the automatic-stay provision. The former is a means to enforce the Code rather than an independent source of substantive authority, see *Kmart*, 359 F.3d at 871 (citing cases), and the latter speaks to the matter indirectly if at all. Section 362(a)(3), the only arguably pertinent provision, blocks "any act to obtain possession of property of the estate or of

property from the estate or to exercise control over property of the estate". Whether or not tax benefits are "property" under the Bankruptcy Code's capacious definition, see *In re Prudential Lines Inc.*, 928 F.2d 565, 571-73 (2d Cir. 1991), an ESOP's sale of stock does not "obtain *possession* . . . or exercise *control*" (emphasis added) over that interest.

Although a sale of stock could affect United's interest in its loss carry-forwards, this would not occur because of anything the ESOP possessed or controlled. *Prudential Lines*, the principal authority invoked in support of the bankruptcy court's decision, dealt with a distinct problem. A family of related corporations had filed consolidated tax returns until one of the firms entered bankruptcy. One non-bankrupt member of the group then proposed to take a worthless-stock deduction on account of its investment in the bankrupt entity; that tax benefit would have come in lieu of the corporate family's accumulated operating losses. *Prudential Lines* holds that taking the deduction would have exercised control over the debtor's operating losses; there is no equivalent example of control (or consumption) of a loss carry-forward in an investor's simple sale of stock. 928 F.2d at 569-70.

Perhaps some other authority supports the bankruptcy court's judgment; it is enough for current purposes to say that an argument based on §105(a) and §362(a)(3) is weak enough to make a bond or adequate-protection undertaking obligatory before a bankruptcy judge may forbid investors to sell their stock on the market. But it is too late to require either form of security. See *Mead Johnson & Co. v. Abbott Laboratories*, 201 F.3d 883, 887-88 (7th Cir. 2000). The controversy has come and gone. Unless United must recompense the investors despite the lack of a bond, we need not (and ought not) reach a conclusion about the merits of the parties' dispute. See *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 94-95 (1998).

"A person injured by the issuance of an injunction later determined to be erroneous has no action for damages in the absence of a bond." *W.R. Grace & Co. v. Rubber Workers*, 461 U.S. 757, 770 n.14 (1983), citing *Russell v. Farley*, 105 U.S. 433, 437 (1882). See also, e.g., *Coyne- Delaney Co. v. Capital Development Board*, 717 F.2d 385, 393-94 (7th Cir. 1983) (if a bond is posted, recompense cannot exceed its amount even if the sum is woefully inadequate). All very well, the Trustee allows, but it insists that this principle is irrelevant because it seeks "restitution" rather than "damages." We held open in *Coyne-Delaney* the possibility that restitution "might be" an exception to the norm that compensation for an erroneous injunction cannot exceed the bond—but our citation to *Mitchell v. Riegel Textile, Inc.*, 259 F.2d 954 (D.C. Cir. 1958), as the sole example of this potential exception shows that the kind of restitution to which *Coyne-Delaney* referred is not what the Trustee has in mind.

James Mitchell, President Eisenhower's Secretary of Labor, made a determination under the Walsh-Healey Act, which provides that vendors of goods and services to the United States must pay their employees "not less than the minimum wages as determined by the Secretary of Labor to be the prevailing minimum wages for persons employed on similar work or in the particular or similar industries or groups of industries currently operating in the locality". 41 U.S.C. §35(a). Contending that the Secretary's prevailing-wage determination was too high, some textile mills filed suit and obtained a preliminary injunction against enforcement of the determination. After the court of appeals reversed the injunction, the Secretary asked the district court to direct the textile mills to pay their workers the minimum wages for work that had been performed while the injunction was in force. The court of appeals held that the mills must top up the wages: the workers had done their part, so the mills must pay the legally required

amount. This compensation is not a form of damages, and although it could be called restitution (else the mills would have been unjustly enriched at the workers' expense) it was not compensation for injury caused by a wrongful injunction. The obligation to pay higher wages came, not from the district court's error in issuing the injunction, but from the Secretary's determination, which had been valid all along. Leading the district court into error, the D.C. Circuit held, did not relieve the employers of their obligation to pay the full wages due under the Secretary's determination, for that obligation predated the litigation and could be enforced, at the Secretary's request, for workers' benefit. See also *Edgar v. MITE Corp.*, 457 U.S. 624, 647-54 (1982) (Stevens, J., concurring).

Here's another example: A nursing home claims a right to compensation at high rates for services rendered to clients in the Medicaid program and obtains a preliminary injunction requiring state officials to pay the claimed rates. Later the court of appeals reverses and holds that the state's proposed (and lower) rate of compensation is valid. The court may require the nursing home to return the excess compensation, in order to give full effect to the state's schedule of payments. *Newfield House, Inc. v. Massachusetts Department of Public Welfare*, 651 F.2d 32 (1st Cir. 1981). Likewise if a preliminary injunction compels Defendant to hand a valuable painting over to Plaintiff, then on the injunction's reversal Plaintiff must return the painting. Reversing the effects of the injunction in order to implement the entitlements that predated the litigation is the sort of restitution we contemplated in *Coyne-Delaney*.

But the Trustee does not rely on any legal right to compensation that it would have enjoyed had this suit never been filed. Nor does it contend that the injunction required a reversible transaction. The harms (loss of liquidity plus uncompensated risk) that investors suffered do not correspond to any gain United enjoyed, nor does United's gain

(retention of the loss carry-forwards) match any investor's loss. Instead the Trustee contends that United's gain is a form of enrichment at the investors' expense, "unjust" because (in the Trustee's view) the injunction should not have been issued. If that were enough to require compensation, then the rule stated in *W.R. Grace* would be defunct, because *every* injunction affords the victor some benefit (why else did the plaintiff sue?) at the loser's expense (why else did the defendant resist?). *Coyne-Delaney* observed that the no-damages rule reflects the norm in American litigation that the parties bear their own expenses; the injunction bond creates a limited exception to that norm. If the Trustee were correct, however, defendants injured by erroneously issued injunctions *always* would be compensated (at least to the extent of the plaintiffs' gains), and the rule would be overthrown. To repeat what was said in *Coyne-Delaney*: the American Rule allowing expenses and injuries of litigation to lie where they fall may be questionable, but its revision is a task for Congress, the Supreme Court, or the bodies that prescribe the federal rules of procedure; the subject is out of an inferior federal court's hands.

The Trustee's contention that the judge's mistake is a "taking" of property, so that the Constitution itself requires compensation, is frivolous. See *In re Chicago, Milwaukee, St. Paul & Pacific Ry.*, 799 F.2d 317, 321-28 (7th Cir. 1986).

The judgment of the district court is vacated, and the case is remanded with instructions to remand to the bankruptcy court, so that the injunction may be vacated as moot to the extent it blocks sale of shares by the ESOP or any of the investors whose stock came through the ESOP. See *United States v. Munsingwear, Inc.*, 340 U.S. 36 (1950).

No. 04-4128 9

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*