Neil W. Bason, United States Bankruptcy Judge
The Second Amended Complaint (adv. dkt. 30, Ex.1, "SAC") asserts a single claim for relief against Defendant, the Bureau of Land Management (the "BLM"), for alleged violation of the automatic stay of § 362(a).[1] Plaintiff ("Debtor") asserts that acts taken by the BLM to terminate certain oil and gas leases of public land (the "BLM Leases") were void for violation of the automatic stay because those acts occurred after Debtor filed its voluntary bankruptcy petition on November 23, 2016 (the "Petition Date").
For the reasons set forth below, this Court will issue a separate order granting the BLM's motion to dismiss the SAC ("MTD," adv. dkt. 36). Because the grounds for dismissal apparently cannot be cured, the tentative ruling is to dismiss the SAC without leave to amend - this Court will address that issue with the parties, and any other procedural issues such as whether to defer issuing the order implementing this Memorandum Decision, at a continued hearing on April 9, 2019 at 2:00 p.m.[2]
1. JURISDICTION, VENUE AND AUTHORITY
This Bankruptcy Court has jurisdiction, and venue is proper, under 28 U.S.C. §§ 1334 and 1408. In addition, for the following reasons this Court also has the authority to issue a "final" order on the MTD.
The SAC fails to "contain a statement" about whether Debtor "does or does not consent to entry of final orders of judgment by the bankruptcy court," as required by Rule 7008 (Fed. R. Bankr. P.). Nevertheless, this Bankruptcy Court concludes that it does have the authority to *689 enter a final judgment or order because the SAC's sole claim is for enforcement of the automatic stay to protect Debtor's (alleged) property interests. Such claims are both statutorily and constitutionally "core." See 28 U.S.C. § 157(b)(2)(A), (E) & (O) ; and see generally Stern v. Marshall , 564 U.S. 462, 131 S.Ct. 2594, 180 L.Ed.2d 475 (2011) ; In re AWTR Liquidation, Inc. , 547 B.R. 831 (Bankr. C.D. Cal. 2016) (discussing Stern ); In re Deitz , 469 B.R. 11 (9th Cir. BAP 2012) (same); In re Ames Dept. Stores, Inc., 542 B.R. 121, 141 & nn. 60, 67 & 79 (Bankr. SDNY 2015) (automatic stay issues are core).
Alternatively, "[e]ven in a non-core proceeding, this Bankruptcy Court can issue final rulings on pretrial matters, including claim-dispositive motions, that do not require factual findings." AWTR Liquidation, Inc. , 547 B.R. 831, 839-40 (citations omitted). No factual findings are required on BLM's MTD, so this Court can issue a final order on that motion.
2. STANDARDS ON MOTION TO DISMISS
On a motion to dismiss for failure to state a claim (Rule 12(b)(6), incorporated by Rule 7012), this Court generally must accept all factual allegations as true and draw all reasonable inferences in the light most favorable to the plaintiff. Doe v. United States , 419 F.3d 1058, 1062 (9th Cir. 2005). But such factual allegations must be "plausible." Ashcroft v. Iqbal , 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting Bell Atlantic Corp. v. Twombly , 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) ).
This Court must consider not only the SAC itself, but also any documents incorporated into the complaint and matters of which a court may take judicial notice. Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007).
3. AUTOMATIC STAY
Section 362(a) provides, subject to certain exceptions, that a bankruptcy petition "operates as a stay, applicable to all entities," of various acts. The SAC does not specify what portion of § 362(a) the BLM is alleged to have violated. This Court will focus on the emphasized text quoted below, because there does not appear to be any theory under which the other subsections would be applicable.
The automatic stay bars:
(1) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title;
(2) the enforcement, against the debtor or against property of the estate, of a judgment obtained before the commencement of the case under this title;
(3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate;
(4) any act to create, perfect, or enforce any lien against property of the estate;
(5) any act to create, perfect, or enforce against property of the debtor any lien to the extent that such lien secures a claim that arose before the commencement of the case under this title;
*690 (6) any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title;
(7) the setoff of any debt owing to the debtor that arose before the commencement of the case under this title against any claim against the debtor; and
(8) the commencement or continuation of a proceeding before the United States Tax Court concerning a tax liability of a debtor that is a corporation for a taxable period the bankruptcy court may determine or concerning the tax liability of a debtor who is an individual for a taxable period ending before the date of the order for relief under this title. [§ 362(a) (emphasis added) ]
4. DISCUSSION
Debtor is not a party to the BLM Leases. The lessees of record are Western States International, Inc. ("Western") and Tearlach Resources California, Ltd. ("Tearlach"). See MTD (adv. dkt. 36), pp. 3:7-10, 4:4-14, & Ex. 2 & 3 (BLM Leases).
It is undisputed that the BLM Leases had a ten year term, and that term has expired. Although leases can be extended by continued production ( 30 U.S.C. § 226(e) ), it is undisputed that production ceased long ago: the SAC concedes that on September 6, 2013 Debtor gave notice of stopping production to the BLM. SAC (adv. dkt. 30, part 1) ¶ 35.
Leases also can be extended in certain other circumstances, including (as discussed in later sections of this Discussion) if wells are "capable" of production in paying quantities. The parties dispute whether the BLM adequately provided notice, either pre- or postpetition, that it had determined there were no such wells and that, therefore, the BLM Leases had terminated by operation of law. But, solely for purposes of the next part of the discussion (part "a"), this Court presumes that the BLM did not provide any effective prepetition notice.
a. As a matter of law, the SAC does not establish any violation of the automatic stay, and apparently the SAC cannot be amended to do so
The SAC fails to state a claim for violation of the automatic stay of § 362(a). Construing the SAC in the light most favorable to Debtor, it alleges that Debtor had a sufficient interest in the BLM Leases as of the Petition Date that any subsequent attempt to terminate the BLM Leases constituted (a) an "administrative, or other action or proceeding against the debtor" that could have been commenced prepetition (§ 362(a)(1), emphasis added) or alternatively (b) an "act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate" (§ 362(a)(3), emphasis added).
But Debtor was not named in any proceeding by BLM, so there was no action "against the debtor" as required by § 362(a)(1). See In re Log , LLC , 2010 WL 4774347, at *2 (Bankr. M.D. N.C. Nov. 9, 2010) (§ 362(a)(1) "has traditionally been interpreted to include only formal legal proceedings against the debtor, and not litigation that collaterally affects the debtor") (citations omitted). See also, e.g., In re Advanced Ribbons and Office Products, Inc. , 125 B.R. 259, 263 (9th Cir. BAP 1991) (§ 362(a) "does not stay actions against guarantors, sureties, corporate affiliates, or other non-debtor parties liable on the debts of the debtor"), and compare *691 In re Excel Innovations, Inc. , 502 F.3d 1086 (9th Cir. 2007) (in limited circumstances, Bankruptcy Court has power under § 105 to enjoin acts against third parties during the case).
True, a proceeding "against the debtor" might include a proceeding against "property" of Debtor. See § 102(2) (claim against a debtor in bankruptcy includes a claim against property of the debtor). In addition, for purposes of interpreting both § 362(a)(1) and (a)(3) this Court notes that "property" of the estate is very broadly defined (§ 541) and generally includes the debtor's own claims against third parties. See generally 11 U.S.C. § 541 ; and see, e.g. , In re Ryerson , 739 F.2d 1423, 1425 (9th Cir. 1984) (bankruptcy estate includes rights such as "choses in action and claims against third parties"). See also In re Windmill Farms, Inc. , 841 F.2d 1467, 1471-72 (9th Cir. 1988) (ability to seek relief from forfeiture belongs to bankruptcy estate).
It is also true that, according to the SAC, Western had transferred an interest in the BLM Leases to Debtor pursuant to a Joint Operating Agreement (the "Agreement"). SAC (adv. dkt. 30, Ex. 1) ¶¶ 4-12. That assertion has been disputed extensively in this and other fora , but it is at least plausible that this was the intent of the parties to the Agreement. Therefore, this Court assumes for purposes of the following discussion that Debtor had a contractual basis to assert an interest in the BLM Leases.[3]
Nevertheless, as the SAC concedes (adv. dkt. 30, Ex. 1, ¶ 13), any assignment or sublease of an oil or gas lease from the BLM is "subject to final approval by the Secretary [of the Department of the Interior, acting through the BLM]." 30 U.S.C. § 187a ;[4] 43 C.F.R. § 3106.7-4 ;[5]
*692 and see MTD (adv. dkt. 36) pp.3:11-4:3 & 7:17-9:22. See also MTD (adv. dkt.36) p. 1, n. 1 (regardless whether a transfer is called an assignment or a sublease, both "require the same application and approval," citing 43 C.F.R. § 3106.7-4 ).
In other words, as of the Petition Date Debtor held a claim against Western, Tearlach, and a long list of other contenders for a partial interest in the BLM Leases. But, as against the BLM, Debtor had only an expectancy that if it applied to be recognized as a sublessee or assignee then the BLM might approve that transfer and thereby give Debtor rights in the BLM Leases that the BLM would recognize. That expectancy has never been realized - it remains only a possibility, not a property interest.
Debtor asserts confidence, based on its past operations and past approvals by the BLM, that it would be deemed "qualified" and that its bond would be considered adequate. Opp. to MTD (adv. dkt. 38) p. 9:6-23. But that is still only an expectancy, not a property interest (and this Court cannot presume that the BLM could not reasonably have a different view about whether Debtor is qualified, or what the bond amount should be).
Therefore, BLM's notice to the lessees of record (Western and Tearlach) was neither a "proceeding against the debtor" (§ 362(a)(1), emphasis added) nor any "act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." § 362(a)(3) (emphasis added). See, e.g. , In re UAL Corp. , 412 F.3d 775, 778 & passim (7th Cir. 2005) ("Whether or not tax benefits are 'property' under the Bankruptcy Code's capacious definition, an ESOP's sale of stock does not 'obtain possession ... or exercise control' over that interest" within the meaning of § 362(a)(3), even though the proposed sale could have an adverse effect on the debtor's interest in loss carryforwards) (citation omitted); United States v. Inslaw, Inc. , 932 F.2d 1467, 1471-74 (D.C. Cir. 1991) (debtor's allegation of pre- and postpetition violation of its rights under software licensing agreement might be actionable breach of contract, but not a violation of § 362(a)(3)); and compare, e.g. , In re Allentown Ambassadors, Inc. , 361 B.R. 422, 433-40 (Bankr. E.D. Pa. 2007) (when debtor itself was franchisee, acts that terminated the franchise constituted acts to control property of estate).
As summarized in Allentown , the cases are not uniform in their analysis of § 362(a)(3). But they all require that some "property" interest of the debtor or estate be at issue.[6]
*693 In sum, even taking the factual allegations of the SAC as true, Debtor cannot establish that the BLM's notice (that the BLM Leases had terminated prepetition) constituted a proceeding "against the debtor," as opposed to a proceeding against Western or Tearlach ( § 362(a)(1), emphasis added) or constituted an act regarding "property" of the estate ( § 362(a)(1), emphasis added). Nor does the SAC state a claim for violation of any other paragraph of § 362(a).
As for any amendment to the SAC to state a claim, that does not appear possible. As a matter of law, and as the SAC concedes, any purported contractual assignment of the BLM Leases is subject to approval by the BLM. So Debtor had only an expectancy not a property interest in the BLM Leases. Accordingly, the tentative ruling is that the BLM's MTD must be granted without leave to amend.
This Court addresses the parties' remaining disputes for the sake of completeness, and because Debtor may argue (although this Court does not concede) that those other disputes have some effect on the foregoing analysis. The remaining disputes all involve the procedures for termination of BLM Leases.
b. Statute and rules governing termination of the BLM Leases
Termination of the BLM Leases in this case is governed by 30 U.S.C. 226(i), which provides in full:
(i) Termination
No lease issued under this section which is subject to termination because of cessation of production shall be terminated for this cause so long as reworking or drilling operations which were commenced on the land prior to or within sixty days after cessation of production are conducted thereon with reasonable diligence, or so long as oil or gas is produced in paying quantities as a result of such operations. No lease issued under this section shall expire because operations or production is suspended under any order, or with the consent, of the Secretary. No lease issued under this section covering lands on which there is a well capable of producing oil or gas in paying quantities shall expire because the lessee fails to produce the same unless the lessee is allowed a reasonable time, which shall be not less than sixty days after notice by registered or certified mail, within which to place such well in producing status or unless, after such status is established, production is discontinued on the leased premises without permission granted by the Secretary under the provisions of this chapter. [Emphasis added.]
In addition to these statutory provisions, the regulations at 43 C.F.R. 3107.2 provide in relevant part:
Subpart 3107-Continuation, Extension or Renewal
* * *
§ 3107.2 Production.
§ 3107.2-1 Continuation by production.
A lease shall be extended so long as oil or gas is being produced in paying quantities.
§ 3107.2-2 Cessation of production.
*694 A lease which is in its extended term because of production in paying quantities shall not terminate upon cessation of production if, within 60 days thereafter, reworking or drilling operations on the leasehold are commenced and are thereafter conducted with reasonable diligence during the period of nonproduction. The 60-day period commences upon receipt of notification from the authorized officer that the lease is not capable of production in paying quantities.
§ 3107.2-3 Leases capable of production.
No lease for lands on which there is a well capable of producing oil or gas in paying quantities shall expire because the lessee fails to produce the same, unless the lessee fails to place the lease in production within a period of not less than 60 days as specified by the authorized officer after receipt of notice by certified mail from the authorized officer to do so. Such production shall be continued unless and until suspension of production is granted by the authorized officer. [Emphasis added.]
c. The evidence is unclear regarding the BLM's Termination Notices
As noted above, the Petition Date is November 23, 2016. The SAC appears to concede that a "60-day" termination notice (the "First Termination Notice") was sent on August 29, 2016, far enough in advance of the Petition Date for the 60 day period to have expired prepetition, if it was an effective notice. SAC (adv. dkt. 30, Ex. 1, part 1) ¶ 38, p. 10:25-27 ("The attached BLM Case Recordation report clearly shows that on 8/29/16, BLM sent a 60-day Written Order") & id. (adv. dkt. 30, Ex. 1, part 4) Ex. 18, at PDF p. 13.
Neither party has provided a copy of the First Termination Notice. But, as discussed below, the parties dispute whether the First Termination Notice was effective.
SAC Exhibit 19 is a copy of a later termination notice (the "Second Termination Notice"). That notice is a certified mail letter from BLM to Western and Tearlach, with a date of February 23, 2017 stamped at the top, entitled "DECISION; Lease Terminated by Cessation of Production." It states that the BLM Leases are "declared terminated, effective January 19, 2017, due to the fact that both leases are in their extended term, held by production, and are no longer capable of producing in paying quantities," and that there is a right to appeal "[w]ithin 30 days of receipt of this decision." SAC (adv. dkt. 30 Ex. 1, part 4) Ex. 19 at PDF p. 15.
As Debtor notes, the Second Termination Notice does not have a typewritten date but instead has the date "23 Feb 2017" stamped on the letter. SAC (adv. dkt. 30, Ex. 1, part 1) ¶ 39 at p. 11:9-12 & id. (adv. dkt. 30, Ex. 1, part 4) Ex. 19 at PDF pp. 14-16. The certified mail delivery records appear to show that this notice was not mailed until approximately May 11, 2017. Id. , Ex. 20. All of these dates are after the Petition Date, so presumably the precise dates make no difference for purposes of the automatic stay (the only claim in the SAC). But perhaps the SAC's point is that (allegedly) the BLM's records are unreliable.
In any event, under the analysis in part "a" of this Discussion, all of the above factual issues in this part "b" are irrelevant. But the disputes about delivery of the First Termination Notice and the Second Termination Notice run through the parties' other disputes that are addressed below.
d. Debtor has not established that its (alleged) status as an "operator" gives it any property interest in the BLM Leases
The SAC alleges that Debtor acted as an "operator" of the oil and gas *695 operations, and that it was recognized as such by the BLM. Although these assertions are not without doubt, this Court accepts them as plausible for purposes of this discussion. See, e.g. , SAC (adv. dkt. 30, Ex. 1) ¶¶ 19-23, 27. Based on this alleged status as an "operator," the SAC apparently asserts that Debtor had not just a contractual interest in the BLM Leases but an ownership interest that the BLM should have recognized.
The SAC's grounds for these assertions are as follows. SAC Exhibit 8 is an email to Debtor, not from the BLM but from the Office of Natural Resources Revenue ("ONRR"), which apparently is another unit within the United States Department of the Interior. That email presumably involves one of the BLM Leases. It states in part:
I understand you are presently operating [a lease].... It does not appear that you are registered in ONRR's system so I wanted to put you in touch with [a specified person who can assist with registration]. As an operator of a Federal oil and gas lease, Riverwood has reporting requirements and other responsibilities .... Please contact [the specified person] so she can help you get set up in our system .... [SAC (adv. dkt. 30, Ex. 1, part 3), Ex. 8, at PDF p. 14 (emphasis added).]
SAC Exhibit 9 is an email to the specified person at ONRR with what appears to be a form to register as a "New Operator." SAC Exhibits 11 and 12 are emails and printouts from a website that purportedly show that Riverwood Energy LLC (Debtor's former name) is listed as an "Operator" and payor by ONRR. (Capitalization altered.) See also SAC (adv. dkt. 30, Ex. 1) Ex. 17 (amendment to LLC articles to change name).
It is unclear if ONRR's apparent recognition of Debtor as an "operator" is the same as recognition by the BLM. But there is some independent evidence that the BLM itself may have recognized Debtor as an "operator," although that also is not entirely clear. SAC Exhibit 14 include "Sundry Notices" from Riverwood Energy LLC regarding several wells (presumably involving the BLM Leases) that are stamped "Operator" and "accepted for the record." (Capitalization altered.) Those stamps might (or might not) mean that Debtor was accepted by the BLM as an "operator."
But the BLM points out that there are different types of "operator," and only some types of operator have any interest in the underlying leases. MTD (adv. dkt. 36) pp. 3:23-4:3 (citing 43 C.F.R. § 3100.0-5(a) & (e) ) & pp. 8:27-9:22 (citing In re Platinum Oil Props., LLC , 2013 WL 6195844 at *9 & *16 (Bankr. D. N.M) ).[7] So any alleged recognition by BLM that *696 Debtor was an "operator" of the BLM Leases has not been shown to establish any cognizable ownership or property interest in the BLM Leases.
This Court recognizes that the SAC draws much more definitive conclusions from its allegations that Debtor was recognized as an operator. The SAC asserts that Debtor "perfected its security interest" [ownership interest?] by (allegedly) registering with the BLM as operator, and "the BLM Leases became undisputed [sic] property of the estate ...." SAC (adv. dkt. 30, Ex. 1) ¶¶ 28-29. First, these assertions are very much disputed.
Second, Debtor's assertions about "perfecting" its interest and obtaining a "property" interest are not factual allegations. They are legal conclusions. This Court is "not bound to accept as true a legal conclusion couched as a factual allegation." Iqbal , 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (quoting Twombly , 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) ); Robinson v. Salazar , 838 F.Supp.2d 1006,1014 (E.D. Cal. 2012) (court is "free to ignore legal conclusions, unsupported conclusions, unwarranted inferences and sweeping legal conclusions cast in the form of factual allegations") (quoting Farm Credit Services v. American State Bank , 339 F.3d 764, 767 (8th Cir. 2003) ).
In other words, regardless whether Debtor was an "operator," it has not established that any such status would give it a cognizable interest in the BLM Leases. Therefore Debtor cannot establish that the BLM's notices regarding those leases violated § 362(a).
e. Debtor's alleged status as an "operator" does not mean that any failure by the BLM to give Debtor notice violates the automatic stay
The SAC appears to assert that, even if Debtor had no property interest in the BLM Leases, nevertheless Debtor as an "operator" of the leases was entitled to receive any notice of termination of the leases. See, e.g. , SAC (adv. dkt. 30, Ex. 1) ¶¶ 19-23 & 27. That may be correct (assuming Debtor was recognized as an "operator").
In addition, according to the SAC, "[h]ad BLM given [Debtor] proper notice, [Debtor] would have demonstrated that it was capable of producing oil and gas in paying quantities, as it had done in the past." SAC (adv. dkt. 30, Ex. 1) ¶ 46. This Court presumes that this is also so, solely for purposes of this part of the discussion.
The BLM argues that any extended term of a lease "automatically terminates by operation of law when paying production ceases," implying that no notice was required. Dkt. 36 (MTD), p. 10:22-24 (emphasis added) (quoting Coronado Oil Co. v. United States DOI , 415 F.Supp.2d 1339, 1347 (D. Wy. 2006) ). But Coronado goes on to recognize several exceptions to any "automatic" termination. Coronado at 1348-50.
In fact, although the first sentence of the statute ( 30 U.S.C. § 226(i), quoted above) appears to make the 60 day period run from cessation of production without requiring any notice, the third sentence might be read to require notice (an issue that this Court does not decide), and in any event the regulations require a 60 day notice from the BLM. As Coronado explains:
The first sentence of section 226(i) does not require any notice be given to an operator/lessee after the cessation of production; rather, the 60 day period to begin reworking or drilling operations runs from the cessation of production. Despite this statutory language, 43 C.F.R. § 3107.2-2 purports to commence *697 the 60 day period for reworking or drilling operations only after notice: "The 60 day period commences upon receipt of notification from the authorized officer that the lease is not capable of production in paying quantities." 43 C.F.R. § 3107.2-2. [The] solution to [what Coronado perceived as an] apparent contradiction between the statutory language and the regulatory language is * * * [that] section 226(i) grants the agency the power to consent to a cessation of production, the regulatory language of section 3107.2-2 does not contradict section 226(i) because it effectively exercises the Secretary's power to consent to certain periods of nonproduction .... [ Coronado , 415 F.Supp.2d 1339, at 1349 & 1349-50.]
This Court agrees that, apart from any statutory requirement, the above-quoted regulations establish that any "automatic" termination is only effective if the BLM first provides 60 days' notice that it has determined such termination has occurred, and the lessee can contest and appeal from that determination. See 43 C.F.R. § 3107.2-2 ("Cessation of production .... The 60-day period commences upon receipt of notification from the authorized officer that the lease is not capable of production in paying quantities") (emphasis added); and 43 C.F.R. § 3107.2-3 ("Leases capable of production. No lease for lands on which there is a well capable of producing oil or gas in paying quantities shall expire because the lessee fails to produce the same, unless the lessee fails to place the lease in production within a period of not less than 60 days as specified by the authorized officer after receipt of notice by certified mail from the authorized officer to do so) (emphasis added).
The BLM's reply (adv. dkt. 39, pp. 5:7-6:5) cites Two Bay Petroleum v. United States Dept. of Interior , 2007 WL 2028192 (E.D. Cal. 2007), for the proposition that the courts should defer to an agency's determination that leases terminated long ago. But Two Bay is inapposite. That case involved a direct review, on appeal, of an agency's acts. It did not involve bankruptcy, so there was no automatic stay that would (allegedly) interfere with any retroactive determination that the BLM Leases were no longer capable of paying production. Nor does the case say anything to contradict the foregoing analysis that, although the BLM's analysis looks to the past, it must provide a 60-day notice and opportunity to contest and appeal that analysis before its determination that the lease has terminated becomes final.
The SAC also provides a sufficient basis to conclude that, not only must notice be provided, it must be provided to the "operator" of the lease. The SAC alleges that the BLM's own handbook H-3107-1 instructs authorized officers ("AOs") that they cannot terminate a lease for cessation of production or for a determination that a well is not capable of production in paying quantities without giving notice to the "operator." See SAC (adv.dkt. 30, Ex. 1, part 1) ¶¶ 9-16 & 69. SAC Exhibit 23 appears to be an excerpt from that handbook, and it provides:
A lease cannot terminate before the AO sends the operator a 60-day letter notifying the operator that the AO has determined that there are no wells on the lease capable of producing oil or gas in paying quantities. The AO will send the operator a 60-day letter even if the last well on the lease has already been plugged and abandoned.
* * *
If the operator can convince the AO that an existing well is capable of producing oil or gas in paying quantities (well test or other acceptable method), or if the operator's efforts to re-work a well or *698 drill another well are successful, the lease is held in production. [SAC (adv. dkt. 30, Ex. 1, part 4) Ex. 23, at PDF p. 25 (emphasis added).]
For all of the foregoing reasons, this Court concludes that under the plausible allegations in the SAC Debtor might have been an operator; the BLM might have been required to notify Debtor before terminating the interests of Western and Tearlach (the lessees of record); and the BLM might have failed to do so. But assuming all those things were proven, that is not enough. Any violation by the BLM of its own procedures, a rule, or a statute, does not establish any violation of the automatic stay. See part "a" of this Discussion, above.
If the BLM violated non-bankruptcy law or rules, perhaps Western or Tearlach could seek relief from the 60-day deadline regarding non-producing wells. Perhaps Western or Tearlach could also seek relief from any deadline to appeal the BLM's decision. Debtor might even have a contractual right and obligation to do those things on behalf of Western or Tearlach. But those are all remedies that must be sought from the BLM, or from courts with jurisdiction over the BLM's decisions, not from this Bankruptcy Court.
f. Debtor has not established that it has standing to assert any lack of notice to Tearlach
The SAC appears to allege that both the First Termination Notice and the Second Termination Notice were not delivered to Tearlach at the correct address. SAC (adv. dkt. 30, Ex. 1, part 1) ¶¶ 40-42 & Ex. 18-21. That appears to be true.[8]
But Debtor is asserting its rights through Western, not Tearlach. So Debtor has not established that it has standing to object to any failure to provide notice to Tearlach.
In addition, this Court takes judicial notice that Debtor has asserted that Tearlach no longer has any interest in the BLM Leases, in other proceedings before this Court. Accordingly, Debtor has not established that any lack of proper notice to Tearlach is relevant.
g. The SAC does not plausibly allege a lack of proper notice from the BLM to Western
The SAC does not allege anything about delivery of the First Termination Notice to Western. Instead it alleges that delivery of the Second Termination Notice to Western was "defective." SAC (adv. dkt. 30, Ex. 1)
*699 ¶ 43. But, unlike the Tearlach address, Debtor does not allege that the Western address was incorrect.
The SAC seeks to raise plausible doubts about any notice to Western on other grounds. SAC Exhibit 22 appears to be a printout from the USPS website showing that the certified mail tracking number listed for Western on the Second Termination Notice is a duplicate, so the website provides no tracking information. SAC (adv.dkt. 30, Ex. 1, part 4), Ex. 22 at PDF pp. 22-23. But the same printout states that "more details" are needed to provide any tracking information, and it instructs the user to "enter send date." Id. There is no allegation in the SAC that Debtor attempted to enter dates at or around February 23, 2017 (the date stamped on the Second Termination Notice) or dates at or around May 11, 2017 (the date when the certified mail records for Tearlach show receipt of the notice by the post office). See SAC (adv.dkt. 30, Ex. 1, part 4) Ex. 20 (at PDF pp. 17-19).
Therefore, it is questionable whether the SAC's assertion about a "defective" Second Termination Notice to Western is plausible. Nevertheless, this Court recognizes that the SAC and its exhibits do raise questions about the BLM's recordkeeping and mailing - the odd use of a date stamp on the Second Termination Notice; the apparent lack of any copy of the First Termination Notice; the apparent lack of any certified mail tracking numbers for the First Termination Notice; and the apparent errors in sending both notices to Tearlach at incorrect addresses. So it is plausible that a reasonably jury (or other finder of fact) might find from this circumstantial evidence that the Second Termination Notice was defective as against Western.
That still leaves the First Termination Notice. The SAC does not actually allege any lack of delivery of the prepetition First Termination Notice to Western. To the contrary, the SAC appears to concede that the First Termination Notice was sent on August 29, 2016. SAC (adv. dkt. 30, Ex. 1, part 1) ¶ 38, at p. 10:25-27 ("The attached BLM Case Recordation report clearly shows that on 8/29/16, BLM sent a 60-day Written Order") & id. (adv. dkt. 30, Ex. 1, part 4) Ex. 18, at PDF p. 13.
Accordingly, the SAC fails to dispute that the BLM Leases were terminated prepetition as to Western, which is the lessee through whom Debtor asserts any interest in the BLM Leases. That undermines Debtor's ability to state any claim for a subsequent violation of the automatic stay because if the BLM Leases were already terminated then the automatic stay could not have applied to protect those leases.
Perhaps Debtor could amend the SAC to allege that, based on circumstantial evidence, the First Termination Notice was not properly delivered. But that any such amendment would not cure the other failures by the SAC to state a claim, as discussed above.
5. CONCLUSION
This Court will issue a separate order directing Debtor to file the SAC as a separate document (if Debtor has not already done so before this Court issues such an order). This Court also anticipates issuing a separate order implementing this Memorandum Decision by granting the BLM's MTD, and dismissing the SAC. The tentative ruling, to be addressed at the hearing on April 9, 2019 at 2:00 p.m., is that such dismissal will be with prejudice.

Unless the context suggests otherwise, a "chapter" or "section" ("§") refers to the United States Bankruptcy Code, 11 U.S.C. § 101 et seq. (the "Code"), a "Rule" means the Federal Rules of Bankruptcy Procedure, Federal Rules of Civil Procedure, or other federal or local rule, and other terms have the meanings provided in the Code, Rules, and the parties' filed papers.

The SAC has not actually been filed. When Debtor failed to file the first amended complaint ("FAC") this Court reminded Debtor that the FAC needed to be filed. Now the same thing has happened again with the SAC.
Perhaps Debtor's failure to file the SAC stems from the following events. Debtor and the BLM stipulated (adv. dkt. 30, the "Stipulation") that Debtor would "have leave to file its [SAC]" (emphasis added) and this Court's order (adv. dkt. 33) (a) approved that stipulation and (b) provided that, once the SAC was filed, it would relate back by being "deemed" filed as of the date of the filing of the Stipulation (emphasis added). Debtor might have misconstrued the latter provision as meaning that the SAC was "deemed" to be filed without actually being filed at all, which is incorrect. In any event, whatever the source of Debtor's confusion, it has failed to file the SAC and will be directed to do so by separate order.

Debtor executed its Agreement with Western under its former name, Riverwood Energy LLC. See SAC (adv. dkt. 30, Ex. 1) Ex. 17 (amendment to LLC articles to change name). The Agreement provides for Debtor and Western to have Participating Interests of 70% and 30%, respectively, in various property, property rights, and hydrocarbons. Agreement § 3.3(A) (adv. dkt. 30, Ex.1, part 2, at Ex.1, PDF p. 12). The Agreement also designates Debtor as an "Operator" with exclusive charge of "all Joint Operations" including "the exclusive right and obligation to represent the Parties in all dealings with the Government ...." Agreement §§ 4.1, 4.2(A), & 4.2(B)(10) (id. at PDF pp. 13-14).
The BLM questions whether the BLM Leases are part of whatever Western purported to transfer to Debtor. MTD (adv. dkt. 36) p. 4:21-23, p. 6:9-10, & pp. 9:22-10:4 & n. 4. Western, Debtor, and others have also litigated in various fora who has what interests, but apparently without any final conclusion. See SAC (adv. dkt. 30, Ex. 1) ¶¶ 17-29) (referencing Kern County Superior Court Case No. 5-1500-CV-272590); id. ¶ 37 (referencing another lawsuit, Inviron Technologies v. WSI , Kern County Superior Court, Case No. 2015-CV-264931); MTD (adv. dkt. 36) pp. 4:24-5:1 (referencing litigation between Debtor and Western); dkt. 130 (Aliet-Gass Motion); Adv. P. No. 2:17-ap-1326-NB (Debtor's claims for declaratory and other relief against Western and numerous other parties). As stated in the text, this Court assumes for purposes of this discussion that the Agreement does in fact purport to transfer the BLM Leases to Debtor.

Section 187a provides, in part:
187a Oil or gas leases; partial assignments
Notwithstanding anything to the contrary in section 187 of this title, any oil or gas lease issued under the authority of this chapter may be assigned or subleased, as to all or part of the acreage included therein, subject to final approval by the Secretary and as to either a divided or undivided interest therein, to any person or persons qualified to own a lease under this chapter, ....

43 C.F.R. § 3106.7-4 provides:
§ 3106.7-4 Effective date of transfer.
The signature of the authorized officer on the official form shall constitute approval of the transfer of record title or of operating rights (sublease) which shall take effect as of the first day of the lease month following the date of filing in the proper BLM office of all documents and statements required by this subpart and an appropriate bond, if one is required. [Emphasis added.]

Some cases look to the degree to which a non-debtor's action "interfere" with or "diminish the value of" the bankruptcy estate's "property rights," and depending on the degree of interference or diminishment such act may "constitute a violation of 11 U.S.C. § 362(a)(3)." Allentown , 361 B.R. 422, at 437, text accompanying n. 34 (emphasis added). Other courts appear to apply variants of the same sort of test, holding for example that "subsection 362(a)(3) does not bar every proceeding hostile to a debtor's claimed interest in property, no matter how intangible, unmatured or unliquidated the debtor's claim, and no matter how indirect the attack upon the estate's interest in property." Id. at 438 (citations and internal quotation marks omitted, emphasis added).
The Allentown court itself applied a more elaborate test, but it too is tied to whether the estate has a "property" right:
First, the court must determine whether the bankruptcy estate has a property right under applicable non-bankruptcy law. Next, the court must determine whether those property rights are property of the bankruptcy estate and the scope of the estate's property interests. Third, if the non-debtor's actions will adversely impact the estate's property interests, the court must then evaluate (1) the nexus between the conduct at issue and the property interests of the bankruptcy estate, (2) the degree of impact on the bankruptcy estate and (3) the competing legal interests of the non-debtor parties. Based on these factors, the court can determine whether the challenged conduct falls inside or outside of the boundary lines of conduct prohibited by § 362(a)(3). [Allentown , at 440 (citations and footnotes omitted, emphasis added) ]

Section 3100.0-5 is entitled "Definitions" and states in parts (a) and (e):
As used in this part, the term:
(a) Operator means any person or entity, including, but not limited to, the lessee or operating rights owner, who has stated in writing to the authorized officer that it is responsible under the terms and conditions of the lease for the operations conducted on the leased lands or a portion thereof.
* * *
(e) Transfer means any conveyance of an interest in a lease by assignment, sublease or otherwise. This definition includes the terms: Assignment which means a transfer of all or a portion of the lessee's record title interest in a lease; and sublease which means a transfer of a non-record title interest in a lease, i.e. , a transfer of operating rights is normally a sublease and a sublease also is a subsidiary arrangement between the lessee (sublessor) and the sublessee, but a sublease does not include a transfer of a purely financial interest, such as overriding royalty interest or payment out of production, nor does it affect the relationship imposed by a lease between the lessee(s) and the United States. [Emphasis added.]

SAC Exhibit 18 appears to be a printout from BLM records including an entry on "05/17/2017" stating "A) [sic] 2ND LTR;ADDRS ERROR." SAC (adv. dkt. 30, Ex. 1, part 4) Ex. 18, at PDF p. 13. This is followed by some "Remark Text" stating:
8/26/16: 60-DAY WRITTEN ORDER ISSUED [i.e., the First Termination Notice]; NO RESPONSE.
A) SENT 2ND DECISION DUE TO ADDRESS ERROR ON OUR PART [in the First Termination Notice]; SENT [the Second Termination Notice?] VIA FED EX; NEW 30 DAY PERIOD APPLIES PER JANELL BOGUE-SOLICITOR-TEARLACH LTR ONLY. JBB [Id. (emphasis added).]
Handwritten on the Second Termination Notice is a notation that it, too, is addressed to Tearlach at the wrong address. SAC (adv. dkt. 30 Ex. 1, part 4) Ex. 19 at PDF p. 15. SAC Exhibit 21 is a copy of a form filed with the California Secretary of State listing a different address for Tearlach than the one on the Second Termination Notice. SAC Exhibit 20 appears to be a printout from the United States Postal Service ("USPS") corresponding to the tracking number listed for Tearlach on the Second Termination Notice, and the last entry for that notice appears to show that it was still at the USPS regional facility, not delivered to Tearlach.